Filed 3/28/25  P. v. Golamrabbi CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HASIB BIN GOLAMRABBI,<br><br>    Defendant and Appellant. | H048223<br>(Santa Clara County<br>Super. Ct. No. C1636583) |

Defendant Hasib Bin Golamrabbi, after representing himself at trial, was convicted by jury on two counts of first degree murder.  The jury found defendant murdered both victims by means of lying in wait and found true allegations attached to both counts that defendant personally discharged a firearm causing death.  The trial court sentenced defendant to two terms of life in prison without the possibility of parole, consecutive to two firearm enhancements totaling 50 years to life.

On appeal, defendant contends he did not knowingly and intelligently waive his right to counsel and the trial court therefore should not have permitted him to represent himself.  He also argues that insufficient evidence supports the jury's lying in wait findings and that the trial court should have entered a judgment of acquittal on those special circumstance allegations at the close of the prosecution's case.  With respect to his sentence, he urges that the trial court should be given the opportunity to exercise its discretion as to imposition of lesser or no firearm enhancements.  He also asserts that his

sentence of life in prison without the possibility of parole is unconstitutional. For the reasons we will explain, we will affirm the judgment.

## I.  TRIAL COURT PROCEEDINGS

Defendant was charged by information with the April 2016 murders of his parents, Golam and Shamima Rabbi. The information alleged defendant caused both deaths by personally discharging a firearm. (Pen. Code, § 12022.53, subd. (d); unspecified statutory references are to the Penal Code.) It also alleged as a special circumstance that defendant committed multiple murders. (§ 190.2, subd. (a)(3).) Notably, the information did not allege defendant committed the murders by lying in wait.

### A. PRETRIAL HEARINGS REGARDING COMPETENCY AND *FARETTA* RIGHTS

Defense counsel declared a doubt as to defendant's competence to stand trial in February 2018. (§ 1368.) Defendant was examined by two court-appointed psychologists, who both concluded he was mentally competent at the time of examination.[1] The trial court found defendant competent to stand trial in July 2018 and noted that defendant waiving his right to counsel was "contemplated" at that time.

Six days later, the trial court held a hearing under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). Defendant provided the court with a signed waiver form stating that he understood the dangers of self-representation and nonetheless wished to waive his right to counsel. In a section of the form referencing the maximum sentence for the charged offenses, defendant wrote, "100 to life, LWOP." In another section pertaining to special allegations, he wrote that the charged firearm allegations would each carry an additional sentence of 25 years to life in prison if found true. By signing the form, defendant certified that he had "read, understood and considered" its contents. Defendant told the court he had completed the form without assistance.

---

[1] The psychologists' reports are sealed, and portions of the parties' briefs discussing the reports have also been filed under seal. We have reviewed the sealed documents and describe them only in general terms where relevant to our analysis.

2

The trial court asked defendant whether he would be ready for the trial scheduled to begin the following month, and defendant said he would. In response to further questioning, defendant explained that he had been conducting legal research as well as reviewing discovery materials and witness statements. A defense investigator had interviewed potential witnesses, but defendant did not intend to subpoena anyone; his prepared questioning was "all cross-examination." With respect to jury selection, defendant was aware that prospective jurors would be completing a questionnaire and he planned to develop questions based on their responses. The court also inquired about defendant's educational background. He reported he had an associate's degree in "Business and computer information systems" and had also completed a semester at San Jose State University, where he studied accounting.

Addressing defendant's request to represent himself, the trial court twice described it as "a very bad idea" and added that it was especially unwise given that defendant was "facing an absolute life sentence." The court told defendant he would be opposed by "an extraordinarily experienced prosecutor" with "substantial homicide trial experience." No matter how gracious the prosecutor might be, the court continued, neither he nor the court could assist defendant with trial strategy. Defendant confirmed that he understood the court's advisements.

The court asked defendant, "And do you understand that if you find yourself floundering – in other words, if you find yourself drowning, that the judge can't do anything about that?" Defendant said he understood. The court then told defendant that counsel would "not be appointed to [him] at that point" and he would "have to proceed forward." Defendant reiterated that he understood the court's warnings.

After the prosecutor and defense counsel indicated their satisfaction with the court's colloquy, the court said to defendant, "I am going to grant your request. It is a constitutional right. It is a very ill-advised idea. Do you understand all of that? And you are really doing it – although, the Court has said to you this is a terrible idea." Defendant

3

again stated that he understood. The court then granted defendant's request to represent himself and relieved defense counsel.

## B. PROSECUTION EVIDENCE

Defendant's brother Omar[2] testified at trial under a grant of immunity from the prosecution. Omar was five years younger than defendant and was 20 years old at the time of trial. Three years earlier, when defendant was 22 years old and Omar was 17 years old, they had been living with their parents at a house in San Jose. Omar described his relationship with defendant as "love and hate."

Omar also had a "love and hate" relationship with his parents. He described his parents as strict and concerned about their children's grades. When defendant and Omar got bad grades or did something wrong, their parents would yell at them and sometimes hit them. Defendant would often respond angrily, while Omar usually responded by walking away or leaving the house. In the months leading up to April 2016, Omar saw defendant argue with Golam and Shamima almost every day. Defendant sometimes talked about wanting to "get rid of them." Between six and nine months before the murders, a neighbor was present for an argument between defendant and Golam and saw defendant make stabbing motions toward Golam while his back was turned.

Omar and defendant planned to attend an anime convention in Oakland on April 23, 2016. That morning, Omar woke up between 7:00 and 8:00. Golam was already awake, but Shamima was still sleeping. Omar went to the bathroom, leaving the door ajar, and saw Golam walk down the hallway toward the garage. He could hear Golam and defendant talking to each other in the garage; it sounded like a normal conversation until Golam yelled, "Hasib, what did you do?" Omar then heard at least four or five gunshots in quick succession.

---

[2] For clarity, and meaning no disrespect, we refer to defendant's relatives by their first names. Consistent with California Rules of Court, rule 8.90, we will do the same for defendant's friend Matthew.

4

Shamima came out of her room to see what was going on. Defendant told her to go back in the room and hide, which she did. He told Omar to close the drapes in the living room. Omar did so and then hid nearby, thinking there might have been an intruder in the house. Defendant appeared to make a 911 call, but Omar could not hear anyone on the other end of the line and thought defendant might have been pretending. Omar heard defendant tell Shamima to "go towards the garage." A few seconds later, Omar heard another gunshot.

Defendant told Omar to get the bag he had packed for the convention and go to the car. On the way to his room, Omar noticed Shamima lying on the floor of the laundry room. He also saw a rifle in the hallway. Omar knew that Golam owned numerous guns, including a rifle.

While Omar was getting his things together, defendant told him that what happened was "for the best." As he was leaving the house, Omar saw defendant write something on a piece of paper in capital letters and stick the paper to the wall using a knife. Defendant came outside and told Omar to "check the garage" to see "if something is coming out." Omar thought defendant was referring to Golam's blood. Defendant went back inside and Omar waited in the car for him.[3] About a half hour later, around 10:00 a.m., defendant returned and began driving to Oakland. The drive took about an hour, and the brothers did not discuss what had happened. They attended the convention and spent the night at a hotel.

The next morning, defendant's cousin called him and expressed concern that Golam and Shamima had not shown up to a family dinner the previous evening. Defendant said he was out of town but would try to contact his parents. About 15 or 20 minutes later, defendant's cousin called again. Defendant said he had tried

_____

[3] A neighbor testified that he was outside that morning and heard someone say something like "check the left side of the garage." He also saw either defendant or Omar sitting in a car.

5

unsuccessfully to contact his parents, and agreed to return to San Jose. An hour later, defendant's cousin called back and asked defendant where he was. Defendant said he had "barely left" and was "picking up gas."

Omar recalled defendant driving to San Jose and parking the car roughly a mile away from the house. Defendant got out of the car and walked away, leaving his cell phone behind and telling Omar to "stay." Omar waited for a half hour or so, then got out of the car. As he left, he saw defendant return to the car and drive away.

Family members entered the house shortly after 1:30 p.m. to check on Golam and Shamima. They saw a message written on the kitchen floor; it said something like "sorry my first kill was clumsy." Defendant's cousin recognized the handwriting as defendant's. Other messages were written throughout the house, including "Your cute when you sleep."; "I force your children to do this. They work for me now. Police, good luck finding my DNA."; "Nothing to worry about. Hasib, you liar. You no longer have to lie about loving them."; "Take care of your brother or he's next."; "At least she died easy. She begged to see your dad but"; and "Hint. Hasib, what's missing?" Family members saw Shamima's body in the laundry room and called the police.

Police searched the house and found Golam's body in the garage. He had been shot 12 times, including eight times in the back; twice in the arm or hand; once in the chest; and once in the neck from close range. Shamima had been shot once in the back of the head from close range, "execution style." A loaded rifle found under a couch in the living room had defendant's DNA and fingerprints on it, as did a soda can found on a table nearby. A pillow on the couch appeared to have a bullet hole in it, and there was a noticeable "defect" in the fireplace. Defendant's cousin told police he had seen a plastic glove in the kitchen.

Two days later, defendant visited his friend Matthew and admitted killing his parents. Defendant told Matthew he was forced to carry out the killings by a vengeful man with a vendetta against Golam and Shamima. The man supposedly snuck into the

6

house once a month to sexually assault defendant, and told defendant the abuse "would continue until he killed his parents." Defendant confessed to Matthew that, as a result of the man's coercion, he had "retrieved his father's rifle and shot his father five times in the back." Shamima crawled out of the room where she was hiding to see what was going on, and defendant "told her to get back inside." When she did not listen but instead continued crawling, defendant shot her in the back of the head.

Defendant asked Matthew to come with him to a motel, where he planned to "record a video of himself saying that he either would move far east or commit suicide." Matthew, wearing a mask and playing the role of defendant's abuser, would then assault defendant; mark him with a knife; and write a message on the wall using his blood. The intended purpose of the video and the staged assault was to prove defendant's innocence. Matthew told defendant he would help, but in reality he did not believe defendant's story and had no intention of helping him. When defendant left Matthew's house the next morning, Matthew called the police.

Police arrested defendant later that day. In an interview with detectives, defendant said he woke up on the morning of the killings to his abuser touching him. The man had supposedly taken photographs and video while assaulting defendant and threatened to share them unless defendant killed his parents. Defendant did not want to, but eventually shot his father once in the back. When Golam did not die instantly from the first shot, defendant's abuser took the gun from him and "emptied the clip" while Golam screamed defendant's name. Defendant said he then heard the man shoot Shamima.

The day after his arrest, defendant spoke to a reporter from the San Francisco Chronicle. Their conversation was recorded and played for the jury. Defendant told the reporter Omar was "innocent." While in jail, defendant sent Omar a letter asking him and Matthew not to testify for the prosecution. (Defendant denied sending the letter.)

Defendant cross-examined Omar about various text messages. Omar once texted a friend about Shamima, "My birth giver signed me up to some gay volunteer shit." In

7

January 2016, Golam suffered a heart attack; when defendant texted Omar to tell him that their father was in the hospital, Omar ignored the message. About a week before the murders, Golam texted Omar, "It's 10:00 p.m. When can I pick you up[?]" Omar replied, "you should know the answer[.]" On the day his parents' bodies were found, Omar texted his cousin, "What is going on? How long do I have to stay in this police car? I'm bored and need to do homework." Omar had dyed red hair during the trial, and stated his parents would not have allowed that.

## C. DEFENSE EVIDENCE

Numerous defense witnesses recalled Golam treating defendant harshly. The witnesses had not personally seen Golam hit defendant, but several described incidents when they believed he had done so. Two witnesses said Golam had treated Omar better than he treated defendant.

Defendant testified in narrative form. He said his relationship with his parents had been "rocky" when he was younger but had later improved. Defendant "started drifting away from Islam" (his parents' religion), which made them unhappy at first, but he eventually reconnected with them and they accepted his interest in Buddhism. According to defendant, Omar's relationship with his parents had deteriorated over time. Once, on a hunting trip when defendant was 14 years old and Omar was nine years old, Omar had "almost shot" Golam during an argument.

Defendant testified that on the morning of the murders, he gave Golam a back massage in the garage and said goodbye to his parents before leaving the house. He waited in the car for about 20 minutes and then went back inside to check on Omar. Defendant saw Omar running to the bathroom. Omar asked defendant to close the blinds and drapes, which he did. Defendant waited in the car for another 20 minutes, at which point Omar came outside. He asked Omar to "check the left side gate of the house" and make sure it was locked. After Omar did so, they left for the anime convention. Omar listened to music in the car and did not seem like he wanted to talk.

8

That night, defendant began getting phone calls from family members about Golam and Shamima. Defendant testified that he was not very concerned at first but tried unsuccessfully to contact his parents. When he got another phone call the next morning, he decided to leave the convention early. On the drive back to San Jose, Omar said to defendant, "hey, can you say it was a self-defense." Defendant asked, "what was self-defense?" and Omar replied, "can you lie and say it was self-defense." Omar explained that he had robbed a Bengali couple using one of Golam's "weapons" and the couple had been "hurt." He had used gloves so only defendant's and Golam's DNA would be on the weapon, and wanted defendant to claim responsibility.

Defendant recalled Omar explaining "that he told the husband to meet him in the garage" and "sit down on a chair" because he had "some exercises to show him." (On cross-examination, defendant confirmed the "exercise" described by Omar involved the husband sitting in the chair and holding his arms out for roughly 30 seconds.) While the husband was sitting in the chair with his back turned, Omar put on gloves and shot the husband with the intent to kill him instantly. Instead, the husband "jumped out in pain" and "yelled out the name of [] one of his children." When the husband "turned around and tried to get the weapon away from him," Omar "fired more rounds" and "emptied the clip on him."

In defendant's telling, Omar further recounted leaving the garage and finding the wife in the living room of the house. Omar told the wife there was an intruder in the house and "she should hide in the garage." He "faked a 911 call and claimed to the wife that the officer" he was speaking to "told them to go into the garage." As the wife crawled toward the garage, Omar panicked and shot her in the back of the head. After telling defendant what happened, Omar revealed that the "couple" was Golam and Shamima. Omar also said "he left a blank paper with a knife through it on the wall."

Defendant said Omar asked him to go to the house and hide the gun. If police found the gun, Omar warned, defendant would have to say he "did it in self-defense" or

9

Omar would tell them defendant "did it just because." Defendant parked "about a mile and a half" from the house and ran there to see if what Omar had told him was true. He left his cell phone in the car because Omar told him to, so he could not call the police. When defendant got to the house, he found Shamima's body on the laundry room floor. Defendant looked for Golam but did not find him because the garage was locked. To protect Omar, defendant wrote messages on the walls of the house. The messages were things defendant had been told by a "nasty person" who "took advantage of" him when he was younger. Although the "nasty person" was not involved in the murders, defendant thought about blaming him.

Defendant found a gun under the living room couch, but someone knocked on the door before he could do anything with it. He put the gun back under the couch and left. When defendant got back to the car, Omar was on the phone. Omar told defendant he had already spoken to police and implicated defendant. Defendant drove away at Omar's suggestion.

A few days later, defendant visited Matthew at his house. Defendant told Matthew there had been a "tragedy" and defendant's parents had been shot. When Matthew asked who shot them, defendant answered, "well, I don't want to say who did it. But if I had to, you know, I would say I was forced to. Let's just put it that way." According to defendant, it was Matthew who suggested that he try to blame the murders on an abuser. Defendant thought Matthew's plan was "dumb" and "weird" but decided to "go along with it" anyway. He admitted lying to detectives about his abuser's involvement in the murders.

Before meeting with detectives, defendant spoke audibly to himself for about two hours in the interrogation room. His statements were recorded and played for the jury. They included: "need to tell the truth – everyone's going to find out – they need to know why"; "I have to tell them"; "how are they going to believe it?"; "I have to tell the officers what happened – it's the only way out"; and "He made me do it – it's his fault –

10

if … they'd still be alive – and they're good people they didn't deserve that but he made me do it – remember he came back after that – yea he was there – but he's never ever going to come back."

Following defendant's testimony, the trial court stated: "Mr. Golamrabbi, the Court would have considered a motion that is often made at the end of the prosecution's case under Penal Code section 1118.1, which is basically that the prosecution does not have enough evidence to be able to let the case go to the jury." The court asked defendant whether he "would have made that motion" and defendant replied, "Yes. But in the event that you would have denied it, I did not want the media to make reports of it." Stating its intent to preserve the issue for a possible appeal, the court said that "had the motion been made the Court would have denied it."

### D. JURY INSTRUCTIONS, VERDICT, AND SENTENCING

The prosecutor requested lying-in-wait instructions as to both murder counts, arguing that defendant's testimony about Omar's supposed confession could be interpreted as a description of defendant's own conduct—which would constitute lying in wait. Defendant agreed to the instruction. The trial court stated that it "initially … did not really see a lying in wait" but considered the instruction "appropriate" with respect to Golam's murder given "the exercise issue in the garage, and the stretching of the arms" testified to by defendant. As to Shamima's murder, the court told defendant: "And it's the same with your mother, that there is evidence – I know that, from your perspective, Omar told her there was an intruder in the house, to not go to the garage, to get down on her hands and knees. There was a lot of detail about what Omar told her, from your perspective, before she was shot." The court instructed the jury on murder by lying in wait, and the jury found the special circumstance true as to both counts.

Between the verdict and the sentencing hearing, defendant requested and was appointed counsel. Defendant was represented by counsel at sentencing. Before sentencing defendant, the trial court stated on the record that the murders "were among

11

the most disturbing, violent, and heinous crimes … that can be committed." The court sentenced defendant to two terms of life in prison without the possibility of parole for first degree murder by means of lying in wait, consecutive to two terms of 25 years to life in prison for the personal firearm discharge enhancements.

## II.  DISCUSSION

### A.  DEFENDANT VALIDLY WAIVED THE RIGHT TO COUNSEL

Defendant contends his waiver of the right to counsel was invalid because the trial court conducted an inadequate inquiry at the *Faretta* hearing and failed to properly advise him on the risks of self-representation. The Attorney General argues defendant knowingly and intelligently waived the right to counsel, and alternatively asserts any error was harmless.

Criminal defendants have a constitutional right to proceed without counsel when they knowingly and intelligently elect to do so. (*Faretta*, *supra*, 422 U.S. at pp. 835–836.) "On appeal, we examine de novo the whole record—not merely the transcript of the hearing on the *Faretta* motion itself—to determine the validity of the defendant's waiver of the right to counsel." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1070 (*Koontz*).) "No particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation; the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." (*Ibid.*)

Noting that his request to represent himself came shortly after the conclusion of competency proceedings, defendant suggests the trial court should have taken into consideration both the timing of the request and information in the court-appointed psychologists' reports. Both psychologists concluded that defendant was competent to stand trial. In *Indiana v. Edwards* (2008) 554 U.S. 164, 178 (*Edwards*), the United States Supreme Court held that "the Constitution permits States to insist upon representation by counsel for those competent enough to stand trial … but who still suffer from severe

12

mental illness to the point where they are not competent to conduct trial proceedings by themselves." The California Supreme Court has had multiple opportunities to mandate representation for such defendants but has declined to do so, instead leaving the denial of self-representation under those circumstances to the discretion of trial courts. (See *People v. Mickel* (2016) 2 Cal.5th 181, 207–208; *People v. Johnson* (2012) 53 Cal.4th 519, 530–531 (*Johnson*).)

Having already found defendant competent to stand trial, the court was not required to inquire further into defendant's mental competence at the *Faretta* hearing unless it was considering denying his request to represent himself on that basis. (*Johnson*, *supra*, 53 Cal.4th at p. 530.) And *Indiana v. Edwards* "does not support a claim of federal constitutional error in a case like the present one, in which defendant's request to represent himself was granted." (*People v. Taylor* (2009) 47 Cal.4th 850, 878.) To the extent defendant asserts he may have been competent to waive counsel at the time of the *Faretta* hearing, but the possibility existed that he could become incompetent to represent himself at some point during the trial, we note that any such possibility would not preclude him from knowingly and intelligently waiving his right to counsel at the hearing. (Cf. *People v. Waldon* (2023) 14 Cal.5th 288, 307 ["When there is reason to doubt a defendant's mental capacity to waive counsel, the court's determination should be made after a careful inquiry into the defendant's competence, including consideration of psychiatric evidence"].) Nor should he have been precluded from exercising his constitutional right to self-representation simply because the *Faretta* hearing was held six days after the conclusion of competency proceedings. (Cf. *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205 [no error in denying Scott's *Faretta* motion made "*immediately after* the trial court denied his *Marsden* motion" and "only because he wanted to rid himself of appointed counsel"].)

Defendant unequivocally stated at the *Faretta* hearing that he wished to represent himself, but now contends the trial court's inquiry and advisements were insufficient to

13

confirm that his waiver of the right to counsel was knowing and intelligent. He focuses primarily on two of the three suggested categories of inquiry discussed in *People v. Daniels* (2017) 3 Cal.5th 961 (*Daniels*): "ensuring the defendant's awareness of the ' "dangers and disadvantages" ' " of self-representation and "informing the defendant that he or she cannot later claim inadequacy of representation" on appeal. (*Id.* at p. 978, citing *People v. Lopez* (1977) 71 Cal.App.3d 568, 572–574 (*Lopez*); see also *Koontz*, *supra*, 27 Cal.4th at pp. 1070–1071.)[4] The "suggested advisements and inquiries" first enumerated in *Lopez* have been treated "as a useful reference for courts to ensure the knowing and voluntary waiver of counsel." (*Daniels*, at p. 978.) But "the purpose of the suggested *Lopez* admonitions is to ensure a clear record of a knowing and voluntary waiver of counsel, not to create a threshold of competency to waive counsel." (*Koontz*, at p. 1071.) Here, the record demonstrates that defendant was—through a combination of oral and written advisements—sufficiently warned about the dangers of self-representation.

Consistent with *Lopez*, the trial court orally advised defendant that representing himself was a "very bad," "very ill-advised," and "terrible" idea; the court would not be able to assist him in his defense; and he would be opposed by "an extraordinarily experienced prosecutor" with "substantial homicide trial experience." Defendant faults the court for not specifically advising him that "self-representation 'is almost always unwise and that he may conduct a defense ultimately to his own detriment' " or that the matchup between him and the prosecutor would " 'definitely not be a fair fight.' " (See *Lopez*, *supra*, 71 Cal.App.3d at pp. 572–573.) Those warnings were at a minimum implicit in the court's oral advisements, and the court was not required to use the precise

---

[4] *Daniels* and *Lopez* also contemplate inquiry aimed at determining a defendant's "intellectual capacity" to waive counsel and represent himself. (*Daniels*, *supra*, 3 Cal.5th at p. 978; *Lopez*, *supra*, 71 Cal.App.3d at p. 573.) Defendant does not appear to suggest the court's inquiry into his educational background was insufficient to establish his intellectual capacity.

14

language from *Lopez* in issuing them. (See *Koontz*, *supra*, 27 Cal.4th at pp. 1070–1072.) Defendant also completed a written waiver form, which further advised him of the dangers and disadvantages of self-representation.

The written form advised defendant that his right to self-representation could be revoked if he engaged in misconduct or obstructed the trial and that, by choosing to represent himself, he would waive any claim of ineffective assistance of counsel. (See *Lopez*, *supra*, 71 Cal.App.3d at p. 574.) Although the trial court did not confirm on the record that defendant had read and understood the form, defendant attested to that on the form itself. The completed form, which defendant told the court he had prepared himself without any assistance, also shows that defendant read and understood its contents. For example, as defendant acknowledges in his reply brief, he correctly and thoroughly answered questions on the form regarding the charges against him and the possible punishment he would face if convicted. He provided similarly detailed answers to questions regarding biographical details, education, and past employment. He placed his initials next to all of the advisements that pertained to his case, while leaving blank those that did not (such as advisements about sex offenses and repeat offenses). "While it is preferable to question a defendant about his responses to a written waiver form, the failure to do so does not necessarily invalidate a waiver where there is no indication the defendant did not understand what he was reading and signing." (*People v. Miranda* (2015) 236 Cal.App.4th 978, 986.) Here, there are clear indications that defendant understood what he read and signed.

Defendant also argues the trial court incorrectly advised him that counsel would "not be appointed" in the event he found himself "floundering" or "drowning" while representing himself. The Attorney General agrees the court's warning was "perhaps hyperbolic" and "technically inaccurate," because the court would retain discretion to reappoint counsel upon request, but at worst the court *overstated* the risks of self-representation and the record does not indicate that defendant relied on the allegedly

erroneous advisement.[5]  Trial courts have broad discretion to deny midtrial requests for counsel by self-represented defendants, and that a defendant regrets having waived his right to counsel does not constitute a compelling ground for revocation of that waiver. (*People v. Lawrence* (2009) 46 Cal.4th 186, 192–195.)  On this record, we conclude the court's inaccurate statement on this point did not prevent a knowing and intelligent waiver of the right to counsel.

This case is distinguishable from *People v. Ruffin* (2017) 12 Cal.App.5th 536 and *People v. Burgener* (2009) 46 Cal.4th 231, two cases relied on by defendant.  In *Ruffin*, a "master calendar court" granted Ruffin's *Faretta* waiver request following a perfunctory colloquy stating "in substance, that it was unwise for him to represent himself" and nothing further.  (*Ruffin*, at p. 546.)  Ruffin had completed a written waiver form, but some responses on the form were incomplete or ambiguous, and he immediately expressed ambivalence about representing himself upon being sent to another department for trial the same day.  (*Id.* at pp. 546–547, 550.)  In *Burgener*, the court did not "advise defendant of the 'possible pitfalls' or 'consequences' of self-representation" but instead "simply *assumed* that defendant was aware of them" and "actively encouraged defendant to represent himself" at a hearing on his application to modify a verdict of death. (*Burgener*, at pp. 241–243.)

Unlike in *Ruffin* and *Burgener*, the trial court here orally advised defendant repeatedly about the negative consequences of self-representation.  Defendant also completed a written waiver form, and his responses on the form confirmed his understanding of both its contents and the charges against him.  In response to the oral

---

[5]  Defendant did eventually request (and receive) counsel between trial and sentencing.  He now asserts he "followed the trial court's erroneous instruction that he could not seek reappointment of counsel during his trial" by waiting until after the verdict to request counsel.  But the court's advisement did not distinguish between the trial itself and post-trial proceedings, and we find defendant's interpretation of the record implausible.

16

and written warnings, defendant unequivocally stated at the *Faretta* hearing that he wished to represent himself. Aspects of defendant's trial may illustrate why the decision to represent oneself is rarely "intelligent" in the colloquial sense, but we must acknowledge defendant's constitutional right to do so. The record as a whole demonstrates that he validly waived his right to counsel.

## B. SUFFICIENT EVIDENCE SUPPORTS THE SPECIAL CIRCUMSTANCE FINDINGS

Defendant contends the evidence is insufficient to show he committed either of the killings by lying in wait. "In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Bolin* (1998) 18 Cal.4th 297, 331 (*Bolin*).) "We must presume in support of the judgment the existence of every fact that the trier of fact could reasonably deduce from the evidence." (*People v. Medina* (2009) 46 Cal.4th 913, 919.) To overturn the jury's finding, "it must clearly appear that upon no hypothesis whatever is there sufficient substantial evidence to support it." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.)

An intentional killing is committed by means of lying in wait if three elements are present: (1) a concealment of purpose; (2) a substantial period of watching and waiting for an opportune time to act; and (3) a surprise attack on the victim from a position of advantage. (*People v. Sandoval* (2015) 62 Cal.4th 394, 416.) "It must also be shown that the defendant did those physical acts with the intent to take his victim unawares and for the purpose of facilitating his attack." (*People v. Mattison* (1971) 4 Cal.3d 177, 183.) "The concealment required for lying in wait 'is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise.' " (*People v. Webster* (1991) 54 Cal.3d 411, 448.) "It is sufficient that a defendant's true intent and purpose were

17

concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." (*Ibid.*)

With respect to Golam's murder, defendant argues the evidence does not sufficiently establish any of the three lying in wait elements. Defendant's argument depends on the premise that his own testimony about *Omar's* supposed confession cannot be treated as evidence of the manner in which *defendant* committed the murder. But the jury could have concluded, as the prosecutor argued, that defendant's testimony actually described his own conduct. There was evidence that defendant provided shifting explanations for the murders over time, first blaming an unidentified abuser in conversations with Matthew and detectives before later claiming at trial that Omar was the killer. Defendant offered progressively more detail in each recounting, while maintaining apparent consistency with the physical evidence. The jury could have concluded under the circumstances that he was attempting to attribute his own actions to others. Viewed as a whole, the record supports a conclusion that defendant lured Golam into the garage under false pretenses and waited until his back was turned to attack him from a position of advantage with the intent to kill—thereby satisfying the elements of lying in wait.

As to Shamima's murder, defendant again challenges all three elements and asserts his intent to kill her "formed at the earliest after she came out of her bedroom the second time and persisted in reaching the garage." The Attorney General disputes that characterization of the evidence. Even assuming insufficient evidence of defendant's intent to kill Shamima before she left her room, the evidence of defendant's actions from that point forward support a lying in wait finding. The jury could have determined that defendant, having already murdered his father, faked a 911 call to conceal from his mother what he had done and convince her an intruder was in the house. The evidence also supports the conclusion that defendant instructed Shamima to crawl toward the garage, intending to kill her by shooting her from behind, and waited until she neared the

18

garage to attack her from a position of advantage.  (Cf. *People v. Nelson* (2016) 1 Cal.5th 513, 551 [insufficient evidence of lying in wait where evidence only showed Nelson "came up behind his victims on foot to take them by surprise" and no evidence showed he "arrived before the victims or waited in ambush for their arrival"].)  Evidence to the contrary—in the form of defendant's testimony that Omar described shooting Shamima in a panic so she would not see Golam's body in the garage—does not require that defendant's version be credited nor preclude the inference that defendant murdered Shamima by lying in wait.

## C. THERE WERE NO GROUNDS FOR A SECTION 1181.1 MOTION AS TO THE LYING IN WAIT ALLEGATIONS

Relying on a discussion that took place during the defense case, defendant contends the trial court should have entered a judgment of acquittal on the lying in wait special circumstance allegations at the close of the prosecution case.  At the time, the allegations had not yet been made.  Defendant essentially suggests he was entitled to a preemptive midtrial judgment of acquittal on uncharged special circumstances, based on *post hoc* legal arguments that were not before the trial court for consideration at the time.  We see no basis for such a judgment.

"In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."  (§ 1118.1.)  As a preliminary matter, the Attorney General argues defendant forfeited his claim by failing to move for a judgment of acquittal at the close of the prosecution case.  After defendant testified, the trial court brought that omission to his attention and informed him for the purpose of preserving the issue for appeal that it would have denied the motion had one been made.  We need not determine whether that colloquy was sufficient to

19

accomplish the court's stated objective because, as we will explain, defendant's claim fails for other reasons.

Assuming without deciding that defendant's claim is preserved for our review, we conclude it lacks merit. A section 1118.1 motion made at the close of the prosecution case must result in acquittal of any "offenses charged in the accusatory pleading" for which there is insufficient evidence. "Review of the denial of a section 1118.1 motion made at the close of a prosecutor's case-in-chief focuses on the state of the evidence as it stood at that point." (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.) The special circumstances at issue here were not charged in the accusatory pleading and therefore were not subject to a judgment of acquittal at the close of the prosecution case. It was only after defendant testified in his own defense, and provided new details about the murders from which the jury could conclude they were committed by means of lying in wait, that the prosecutor requested on the record lying in wait instructions on both murder counts. (Though defendant asserts in his reply brief that the prosecutor "was considering lying-in-wait theories" days before the parties discussed those theories on the record, that is speculative and in any event would not change the fact that no lying-in-wait special circumstances were charged before the close of evidence.)

The proper avenue for challenging the lying in wait allegations in the trial court would have been an objection to the addition of uncharged special circumstances following the close of evidence, not a premature motion for acquittal at the close of the prosecution case. Rather than opposing the prosecutor's request, however, defendant expressly agreed on the record to the lying in wait instructions. Although it is understandable that defendant would now consider that choice a mistake, the court had no duty to preemptively enter a judgment of acquittal on then-uncharged allegations at an earlier point in the trial.

20

**D. RECONSIDERATION OF THE FIREARM ENHANCEMENTS IS NOT REQUIRED**

At a sentencing hearing held on August 30, 2019, at which defendant was represented by counsel, the trial court imposed two 25-years-to-life enhancements for personal discharge of a firearm causing death.  (§ 12022.53, subd. (d).)  Defense counsel did not ask the court to strike or dismiss those enhancements, or to impose lesser enhancements.  On appeal, defendant argues we should remand the matter to allow the trial court to exercise its discretion as to the imposition of those or lesser enhancements under *People v. Tirado* (2022) 12 Cal.5th 688 (*Tirado*).

We agree with the Attorney General that forfeiture applies under the circumstances here.  Several months before defendant was sentenced, one appellate court held that when a sentencing court exercised its discretion to strike or dismiss a firearm enhancement imposed under section 12022.53, subdivision (d), it had discretion to impose a lesser uncharged enhancement under section 12022.53, subdivisions (b) and (c).  (*People v. Morrison* (2019) 34 Cal.App.5th 217, 222–223.)  By the time of the sentencing hearing, another appellate court had disagreed and concluded that sentencing courts lacked discretion to impose lesser enhancements that had not been found true.  (*People v. Tirado* (2019) 38 Cal.App.5th 637, 643–644, revd. and sub. opn. by *Tirado*, *supra*, 12 Cal.5th 688.)  (The California Supreme Court later granted review in that case and ultimately agreed with *Morrison* in *Tirado*, *supra*, 12 Cal.5th at p. 697.)  But it would not have been "futile or wholly unsupported by substantive law then in existence" for defendant to request at the time of sentencing that the court strike or dismiss the 25-years-to-life enhancements and impose lesser ones.  (See *People v. Welch* (1993) 5 Cal.4th 228, 237.)  Having not done so, defendant cannot now argue on a silent appellate record that the court abused its discretion.

We also reject defendant's alternative contention that his counsel was ineffective in not asking the trial court to impose a lesser enhancement under *Morrison*.  To establish ineffectiveness of trial counsel in violation of a defendant's right to counsel under the

Sixth Amendment, a defendant must show both that counsel's performance was deficient and that he was prejudiced by the deficiency. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216–217.) Deficient performance is rarely shown if there was a tactical reason for trial counsel's conduct. (See *People v. Cruz* (1980) 26 Cal.3d 233, 255–256 ["except in rare cases, an appellate court should not attempt to second-guess trial counsel as to tactics"]; *Bolin*, *supra*, 18 Cal.4th at p. 317 [affirming conviction where alleged failure to object "may well have been 'an informed tactical choice within the range of reasonable competence' "].) To prove prejudice, a defendant must affirmatively show a reasonable probability that, but for trial counsel's errors, the result would have been different. (*Ledesma*, at pp. 217–218.)

Here, counsel may have refrained from asking the trial court to impose lesser enhancements under the reasonable belief that the court would be unlikely to do so. (See *People v. Fuhrman* (1997) 16 Cal.4th 930, 945 ["In many cases" the full scope of a sentencing court's discretion "may not have been mentioned at sentencing by either the trial court or defense counsel because all those involved in the proceeding recognized that, in view of the defendant's background and the circumstances of the current offense, the exercise of such discretion in the defendant's favor was not a realistic possibility"].) We need not determine whether counsel's performance was deficient, however, because on this record we see no reasonable probability that the court would have imposed a lesser enhancement if asked. (See *Strickland v. Washington* (1984) 466 U.S. 668, 697 ["The object of an ineffectiveness claim is not to grade counsel's performance"].)

Before sentencing defendant, the trial court stated in part: "The Court generally does not make long speeches at this stage of the proceedings, but I do feel it incumbent upon the Court to make the following observations. [¶] These killings were among the most disturbing, violent, and heinous crimes I think that can be committed." The court noted several aspects of the murders, including the manner in which they were committed and their impact on members of defendant's family and their friends. Although the court

22

determined defendant would serve two terms of life in prison without the possibility of parole for the murders themselves, the court also imposed the two 25-years-to-life enhancements despite presumably understanding that it had discretion to strike or dismiss those enhancements entirely. Given its imposition of the maximum permissible sentence, nothing in the record suggests the court might have imposed lesser enhancements had defense counsel brought that option to its attention.

### E. DEFENDANT'S CONSTITUTIONAL CHALLENGE TO HIS SENTENCE MUST FAIL

In his opening brief, defendant argued his mandatory sentence of life in prison without the possibility of parole (§ 190.2, subd. (a)) is unconstitutional. His contention was that section 3051, which provides youth offender parole hearings to other youthful offenders but does not apply "to cases in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age" (§ 3051, subd. (h)), violates the equal protection clauses of the United States and California constitutions. In *People v. Hardin* (2024) 15 Cal.5th 834, decided after defendant filed his opening brief, the California Supreme Court found a rational basis for the Legislature's exclusion of young adult offenders sentenced to life in prison without the possibility of parole in section 3051, subdivision (h). In his reply brief, defendant "acknowledges that *Hardin* controls here but seeks to preserve the issue for purposes of federal appellate review and thus maintains that [his] Fourteenth Amendment right to equal protection is violated by section 3051's preclusion on parole for youthful offenders like him." We are bound by the Supreme Court's decision in *Hardin* to reject defendant's claim. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### III.    DISPOSITION

The judgment is affirmed.

23

_____

Grover, J.

**WE CONCUR:**


_____

Greenwood, P. J.


_____

Lie, J.


H048223
_The People v. Golamrabbi_